IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL D. HANNA,

      Plaintiff,                               04cv1294

v.                                      <span style="color:red">**ELECTRONICALLY FILED**</span>

SE HOLDINGS, LLC,

      Defendant.

**October 20, 2005**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.  Findings of Fact

#### A.  Parties' Joint Stipulations of Findings of Fact

1.  Plaintiff Michael D. Hanna ("Hanna") is a citizen of Florida, residing at 9801 Blandford Road, Orlando, Florida 32827.

2.  Hanna is not a citizen of Pennsylvania.

3.  SE Holdings, L.L.C. ("SEH") is a Delaware limited liability company with a registered agent listed as The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

4.  The amount in controversy exceeds $75,000.00.

5.  This Court possess jurisdiction over this case.

6.  Venue is proper in this judicial district.

7.  Pennsylvania law governs the substantive aspects of this case.

8.  Richard Zomnir ("Zomnir") is a citizen of Pennsylvania residing at 141 Beech Ridge

Drive, Sewickley, PA  15143.

    9.  Strategic Energy Incorporated ("SEI") is a Pennsylvania S Corporation and general partner of SEH.

    10.  Strategic Energy, L.L.C. ("Strategic Energy") is a Delaware limited liability company with its principal place of business at 2 Gateway Center, Ninth Floor, Pittsburgh, Pennsylvania 15222.

    11.  Chester Babst ("Babst"), Frank Clements ("Clements"), Dean Calland ("Calland"), and Zomnir formed the law firm of Babst, Calland, Clements & Zomnir, P.C. ("BCCZ") in 1986. As a result of work arising out of the deregulation of the natural gas industry in the mid 1980s, Zomnir began providing energy management and consulting services to large industrial clients of BCCZ.  Because those services were not necessarily legal services, Strategic Energy Ltd. was formed as a wholly owned subsidiary of BCCZ in September, 1991.

    12.  In January, 1996, BCCZ established Strategic Energy, Ltd. as a separate company, owned by certain individuals who were either shareholders or employees of BCCZ or employees of Strategic Energy Ltd.

    13.  The general partner in what was then Strategic Energy Partners, Ltd. was Strategic Energy, Inc. ("SEI"), a Pennsylvania Subchapter S Corporation owned equally by Babst, Calland, Clements, and Zomnir.  The remaining owners of Strategic Energy were limited partners.

    14.  In September, 1998, Strategic Energy Partners, Ltd. was converted into SEH.  SEI was the voting member of SEH with the limited partners becoming non-voting members.

    15.  At the same time, SEH formed, wholly owned, and transferred all of its assets and liabilities to Strategic Energy Ltd.

16.   Strategic Energy is an energy management company that provides retail electricity service in competitive markets nationwide.  At least throughout 2004, Strategic Energy procured and managed over $2 billion of electricity and natural gas per year and had over $1 billion of annual revenue and no debt.

17.   Zomnir was the CEO of Strategic Energy from at least January, 1999 through April 1, 2004, and the other employee owners of Strategic Energy included James Booritch, Pat Purdy, Alex Galatic, Joe Kubacki, and John Molinda.

18.   Zomnir was President of SEH from December 31, 1999 through at least April 1, 2004.

19.   In January, 1999, SEH and Strategic Energy entered into an agreement with Custom Energy, LLC pursuant to which certain subsidiaries of Great Plains Energy ("GPE") obtained a seventy-five percent ownership interest in and SEH retained a twenty-five percent ownership interest in Strategic Energy.

20.   The GPE executive charged with managing GPE's investment in Strategic Energy was Gregory Orman ("Orman").

21.   Effective December 31, 1999, SEH, through its president, Zomnir, executed a Limited Liability Company Agreement of Custom Energy Holdings, L.L.C. ("Operating Agreement"), which was principally negotiated on SEH's behalf by Zomnir and Babst.

22.   The purpose of Custom Energy Holdings, L.L.C. ("CEH, LLC") included holding all of the ownership interests of, *inter alia*, Strategic Energy.

23.   SEH was a "member" of Custom Energy Holdings, L.L.C.

24.  The Operating Agreement expressly provided SEH with a "put option" permitting it to "put" all or part of its economic and/or voting interest to CEH, LLC and obligating CEH, LLC to purchase such interest, if certain events did not happen.

25.  SEH could exercise its "put option" within the 90 days following January 31, 2004 if CEH, LLC had not consummated an initial public offering, merged with or into another entity, or dissolved or liquidated its assets by January 31, 2004.

26.  The Operating Agreement provided that "[t]he 'fair market value' of the Put Interest shall be determined by the mutual agreement of [GPE] and [SEH] or, if [GPE] and [SEH] cannot agree upon such value, then by appraisal by one or more third party appraisers selected by [GPE] and [SEH] with significant experience in valuing companies of the size and otherwise similarly situated as the Company."

27.  In two transactions in 1999 and 2000, GPE through its subsidiaries, purchased the ownership interests in Strategic Energy held by various non-Strategic Energy employee shareholders.

28.  After those transactions, SEH retained an 11.45% economic and voting interest in and GPE, through a number of its direct and indirect subsidiaries, owned an 88.55% economic and voting interest in CEH, LLC and indirectly in Strategic Energy.

29.  In the Spring of 2003, SEH, acting through Zomnir, retained Smith Evans Carrier ("SEC") to value an ownership interest in and provide an opinion as to the fair market value of Strategic Energy.

30.  Frank Evans ("Evans") and Kelly Carrier ("Carrier") performed the work done by SEC.

31.  SEH agreed to pay, and did pay, SEC $25,000  for its work in connection with issuing a written opinion of the fair market value of  Strategic Energy, LLC.

32.  Hanna became acquainted with Orman when the two of them were Board members at a Canadian corporation known as Bracknell Corporation.

33.  In May, 2001, Orman called Zomnir and told Zomnir that he was sending Hanna to Strategic Energy to evaluate the management of Strategic Energy and, in particular, Zomnir's management skills.

34.  Hanna visited Strategic Energy's Pittsburgh office in May, 2001 and spent two days meeting with various management employees, including Zomnir.  At the conclusion of that review, Hanna advised Orman that Zomnir was doing a good job of running the company but suggested that he could assist Zomnir and the company with communication seminars and executive coaching.

35.  By way of a letter agreement dated August 15, 2001, Strategic Energy and Hanna entered into a contract for Hanna to provide communication training and executive coaching to Zomnir and Strategic Energy.  The agreement provided Hanna 10,000 options in Strategic Energy as compensation.

36.  After providing these services for a period of time, Hanna, Zomnir, and Orman agreed that Hanna should continue providing these services but, at Orman's insistence, the compensation arrangement was changed such that Hanna was paid $10,000 per day plus expenses, for each seminar attended by 100 or more Strategic Energy employees, and $5,000 per day, plus expenses, for each seminar attended by fewer than 100 Strategic Energy employees.

37. Zomnir and Hanna also entered into an agreement pursuant to which Hanna agreed to provide executive coaching to Zomnir and other Strategic Energy management personnel for $5,000 per month.

38. The executive coaching arrangement provided Zomnir the ability to discuss with Hanna, by telephone and e-mail, issues concerning any aspect of Strategic Energy's business and to meet with Hanna to discuss those issues whenever Hanna was in Pittsburgh to conduct communications or new hire seminars for Strategic Energy.

39. From May, 2001 through March of 2004, Hanna received more than $900,000 in payments from Strategy Energy for executive coaching and seminars.

40. Commencing in early 2003, Zomnir, on behalf of SEH, began discussions with GPE, through its then CEO Bernie Beaudoin, to determine the fair market value of Strategic Energy in order to place a fair market value on the "Put Interest" held by SEH.

41. In early September, 2003, SEH retained the services of Paul "Mickey" Pohl ("Pohl"), a senior litigation partner at the Pittsburgh office of Jones Day, and the Jones Day firm to represent SEH's interest in connection with a potential dispute with GPE regarding the valuation of Strategic Energy for purposes of SEH's "put" interest.

42. Pohl began working on SEH's matter on September 6, 2003.

43. During a dinner meeting on September 23, 2003 at Palomino's Restaurant in Pittsburgh, Pennsylvania, Zomnir, on behalf of SEH, and Hanna tentatively agreed to the terms of an oral contract for Hanna to represent SEH.

44. Other than Hanna, Zomnir was the only person involved in the discussion where the contingent fee contract was discussed and entered.

45.  Zomnir promised Hanna that he (Zomnir) and his partners would provide Hanna with any information he requested in connection with his negotiations with GPE.

46.  SEH and GPE agreed to an alternative dispute resolution ("ADR") and binding appraisal process set forth in a letter agreement dated February 9, 2004, whereby, *inter alia*, three appraisal firms would assign both a discounted and non-discounted value to Strategic Energy; the question of whether a minority interest discount should apply to SEH's 11.45% interest in Strategic Energy would be submitted to a neutral arbitrator; and after the neutral's decision regarding the applicability of a minority interest discount, the relevant numbers from the appraisal firms would be averaged, with the average becoming the enterprise value for Strategic Energy.

47.  On February 23, 2004, Zomnir sent an e-mail message to Hanna requesting that Hanna make himself available for a call with Zomnir and Pohl to prepare for a March 10 arbitration before retired Second Circuit Court of Appeals Judge George C. Pratt regarding the minority interest discount issue.  The arbitration was being held in accordance with the February 9, 2004 letter agreement between SEH and GPE.

48.  Hanna attended the arbitration in Uniondale, New York before Judge Pratt and testified on behalf of SEH, as did Zomnir, Babst, and Purdy.

49.  As of the date of the arbitration (March 10, 2004), Zomnir owned 2.76% of Strategic Energy.

50.  Judge Pratt ultimately determined that no minority interest discount should apply to SEH's "put" interest.

51.  The fair market value of Strategic Energy for purposes of SEH's "Put Interest" was determined to be $776,000,000.

52.  Each of the owners of SEH received an amount of money equivalent to their respective ownership interests in SEH based on the $776,000,000 valuation.

53.  The closing of the exercise of the "put" and transfer of funds to SEH and its members occurred on or about May 10, 2004.

**B.  Findings of Fact by the Court**

**1.  June 11, 2002 Transactions**

54.  In a transaction effective June 11, 2002, a GPE entity purchased preferred stock owned by SEH.  Greg Orman ("Orman") was the principal decision-maker on behalf of the GPE entity involved in the June 11, 2002 transaction.

55.  One business goal of GPE in conducting the June 11, 2002 transaction was to remove the non-Strategic Energy management shareholders of SEH (i.e., Babst, Calland, and Clements) from the decision-making process in SEH.

56.  Paragraph 14(a) of the June 11, 2002 Purchase Agreement to which SEH and all its members were parties, in relevant part, gave Zomnir "sole, exclusive, unfettered irrevocable authority and empowerment with respect to, and in all matters relating to" SEH's ownership interest in CEH LLC.  Paragraph 14(b) provides, in relevant part, that Zomnir "shall have no duties (fiduciary or otherwise) or liability whatsoever for any and all acts or failures to act with respect to" SEH's ownership interests and the "authority and empowerment provided in clause

(a)" above.[1]

57.  At no time from June 11, 2002 through May 2004, was the authority given to Zomnir in the June 11, 2002 transaction Purchase Agreement ever rescinded.[2]

## 2.  SEH Search for a Negotiator re: Orman

58.  In late 2002, Zomnir asked Orman if Orman would represent SEH in the negotiation process to "put" SEH's interest to GPE.  At the time, Zomnir told Orman that he believed the total enterprise valuation for Strategic Energy would be $350,000,000.  Zomnir proposed to pay Orman 10% of any amount SEH received as a result of a valuation of Strategic Energy over

---

[1]The full text is as follows: "SE Holdings, Babst, SE Inc. and each of the SE Holdings Owners further covenant, warrant and represent as follows:  (a) Immediately after the consummation of the transactions contemplated in this Agreement, and during the period commencing on the Closing and ending fifteen (15) years after the death of the last surviving individual SE Holdings Owner, Richard M. Zomnir (the "Agent") shall have the sole, exclusive, unfettered and irrevocable authority and empowerment with respect to, and in all matters relating to, the Series CE Economic Interests, Series CE Voting Interests, Series SEL Economic Interests and Series SEL Voting Interests issued by Custom Energy Holdings then owned by SE Holdings and as thereafter may be acquired from time to time by SE Holdings, Babst, SE Inc., the SE Holdings Owners or any Affiliate (as defined in the CEH LLC Agreement)thereof (Collectively, the :Interests"), including without limitation voting authority and empowerment and investment authority and empowerment as to any and all decisions, actions and any and all other things whatsoever relating to the ownership, holding, sale, transfer or other disposition of the Interests. (b) The Agent (and any and all successors thereto) shall have no duties (fiduciary or otherwise) or liability whatsoever for any and all acts or failures to act with respect to the Interest and the authority and empowerment provided in clause (a) of this Section.  (c) The limited liability company agreement of SE Holdings shall be, and hereby is, amended to provide for the elimination of any and all duties (fiduciary or otherwise) and liability of the Agent (and any and all successors thereto) as provided in clause (b) of this Section to the maximum extent permitted by the Delaware Limited Liability Company Act, as amended from time to time."

[2]Although Zomnir contends that he did not have sole authority to bind SEH and that he regularly took important matters to Babst, Calland and Clements for approval, such position is inconsistent for the clear and unambigious language of paragraph 14 of the June 11, 2002 Purchase Agreement.

$350,000,000 as compensation for Orman's negotiation and representation services.  Importantly, Zomnir's proposal to Orman contained no deadlines for Orman's performance.

59.  Orman declined Zomnir's proposal because Orman was employed by GPE until the end of December, 2002, and believed it would not be appropriate to represent SEH in negotiations with GPE until his GPE employment was terminated.

### 3.  Smith Evans Carrier

60.  As stated above, in Spring of 2003, Zomnir, on behalf of SEH, retained Smith Evans Carrier to value an ownership interest in Strategic Energy, and SEH paid SmithEvans Carrier $25,000 for this initial valuation of Strategic Energy.

61.  After completing the initial valuation, SEH then engaged Smith Evans Carrier to assist in the negotiations to reach a settlement of the "put" with GPE.  The terms proposed by Smith Evans Carrier for this second task included a contingency fee that escalated in percentage based upon the valuation ultimately determined for Strategic Energy.  In response, Zomnir on behalf of SEH made an alternative proposal that SEH would pay Smith Evans Carrier five (5%) percent of the amount received by SEH as a result of any valuation of Strategic Energy which exceeded $600,000,000.

62.  By letter, dated October 6, 2003, to Zomnir, Evans memorialized Zomnir's proposal.  Although Zomnir never signed the letter, an oral contingent fee contract was entered into between Smith Evans Carrier and SEH during a discussion Evans had with Zomnir regarding the October 6, 2003 letter.  Importantly, if SEH would have had to sue GPE in order to exercise the "put" at a fair valuation of Strategic Energy, that suit would not have voided this contingent fee contract, and further, this Agreement contained no deadlines for the performance of Smith Evans

Carrier - - only an engagement end date (i.e., December 31, 2004).

### 4. Hanna - Background

63.  In 2001, Hanna entered into a contract with Strategic Energy for Hanna to provide executive coaching/consulting services to Zomnir and Strategic Energy.  This contract was extended through 2007 in a letter to Hanna dated April 4, 2003.  As summarized above, Hanna also had a contract with Strategic Energy to provide communication and sales seminars.  For such seminars attended by 100 or more Strategic Energy employees, Hanna was paid $10,000 per day, plus expenses.  For seminars attended by fewer than 100 Strategic Energy employees, Hanna was paid $5,000 per day, plus expenses.

64.  In early 2003, Zomnir, on behalf of SEH, commenced negotiations to determine the fair market value of Strategic Energy so that a fair market value on the "put" interest held by SEH (11.45%) could be established.  Zomnir kept Hanna informed of the negotiations and sought Hanna's advice as to how to proceed in the negotiations.

### 5. Hanna - Daily Fee Agreement

65.  During a telephone conversation in early September, 2003, Zomnir and Hanna entered into a daily fee agreement, pursuant to which Hanna would assist in, and represent SEH's interests in, the "put" negotiations.  Zomnir agreed to pay Hanna a daily rate of $7,500 (which was midway between the $10,000/day and $5,000/day seminar rates) to represent SEH in the negotiations and exercise of the "put."  (There was no agreement on expenses.)  A payment of $7,500 per day was reasonable and fair based upon the course of dealing between the parties.  In fact, the parties expressly used that course of dealing in arriving at the $7,500 per day amount.  Zomnir had full and sole authority to enter into this Agreement.  *See* Findings of Fact 56 and 57.

The daily rate was payable without regard to the outcome of any negotiations or exercise of the "put" or the amount of the final valuation.  This agreement constitutes (coupled with the Hanna Contingent Fee Agreement of September 23, 2003) Zomnir's "non-litigation" portion of his overall "put" strategy.

### 6.  Pohl - Background

66.  Zomnir also developed and implemented the "litigation" portion of his overall "put" strategy at about the same time in early September, 2003.  Zomnir, on behalf of SEH, retained Pohl, the nationally-known senior litigation partner at Jones Day, to prepare for possible litigation against GPE.  (This "litigation" should not be confused with the arbitration re: minority interest issue, where Pohl also served on counsel.)  Thus Zomnir simultaneously pursued a negotiation (non-litigation) approach using Hanna (and others) and a litigation approach using Pohl (and others).

### 7.  Hanna - Contingent Fee Agreement

67.  In addition to the Daily Fee Agreement, during a dinner meeting on September 23, 2003, at Palomino's restaurant in Pittsburgh, Zomnir, on behalf of SEH, and Hanna entered into a contingent fee contract.  Zomnir had full and sole authority to enter into this Agreement.  *See* Findings of Fact 56 and 57.  Under the contract, if the total enterprise valuation of Strategic Energy exceeded $600,000,000 in connection with the "put" of SEH's beneficial interest in Strategic Energy, Hanna would receive as compensation 20% of the 11.45% "Put Interest" of the total valuation of Strategic Energy in excess of $600,000,000.  Hanna immediately began performance thereunder.

-12-

68.  Based upon the credibility of the witnesses, the Court finds that Zomnir did not condition the Contingent Fee Agreement and the Daily Fee Agreement on the valuation process being completed by certain date, nor payment being made to SEH for the "Put Interest" by a certain date.[3]  Likewise, at no time did Zomnir tell Hanna that, if SEH had to pursue the "litigation" option or actually commenced litigation against GPE, Hanna would not be paid under these Agreements.  On the contrary, both the litigation and non-litigation options were conducted in "parallel".

69.  This credibility decision between Hanna and Zomnir was required in this case. Based upon the demeanor of the witnesses, the consistency/inconsistency of their testimony, and the consistency/inconsistency between their testimony and the trial exhibits, the Court as the finder of fact resolved the credibility decision in favor of Hanna.  In fact, Zomnir was not credible.  He claimed that he was unaware of provisions of June 11, 2002 Purchase Agreement granting him full authority to make all decisions (including sale or transfer) relating to SEH.  His denial of authority to enter into the Daily Fee Agreement and the Contingent Fee Agreement is inconsistent with paragraph 14 of the June 11, 2002 Purchase Agreement.  He signed documents which he claimed that he did not read and which contained false information, including personal

---

[3]Defendant wished to offer hearsay testimony of Zomnir's partners (and possibly others) to the effect that Zomnir told them that the Contingent Fee Agreement had firm deadlines.  Such evidence, when offered by defendant, is hearsay, despite defendant's efforts to try to place the testimony into one or more "exceptions."  Much of this testimony, however, came into evidence, for a various of reasons, as the questioning progressed throughout the trial.  The Court obviously read the offers of proof to decide the motions in limine and objections at trial.  As to the limited amount of "hearsay" evidence not admitted, such evidence was duplicative of admitted testimony, and such testimony would not change the Court's decision, as the finder of fact, that Hanna is believable (and Zomnir is not) as to the terms of the Contingent Fee Agreement reached between Hanna and Zomnir at the September 23, 2003 dinner (in particular, whether the Agreements contained deadlines) - - where none of these other "witnesses" were present.

-13-

information relating to his stock ownership.  He also consistently signed SEC Form 10-Ks and

Form 10-Qs containing false information relating to his ownership interest in SEH.  Further, his

testimony was inconsistent within itself and with numerous trial exhibits, and he was often

evasive on cross-examination.

70.  Although Zomnir claimed at times in his trial testimony that the non-litigation track

was not simultaneous with the litigation track, Zomnir's testimony is inconsistent with (a) Joint

Exhibit 44, in which Zomnir said to Hanna that Zomnir was "going to work with [litigation

counsel] on a parallel path to get [Pohl] ready . . ." (b) and Zomnir's testimony on cross

examination.

71.  Also, Zomnir claimed that Hanna would receive payment only if Hanna obtained an

acceptable "settlement" amount, and not if the amount was achieved through a negotiation

process, even though Zomnir involved Hanna in the "negotiation" process.  This position was not

credible.  Further, Zomnir's actions throughout the Fall and Winter of 2003 were inconsistent

with the alleged existence of deadlines for Hanna's work.  In Zomnir's assessment of the process

prepared on December 3, 2003, Zomnir still wanted Hanna to manage the valuation process.

However, in that same assessment, Zomnir also was laboring under the perception that the

valuation reports would not be completed until January 15, 2004, with the closing and payment

to occur on January 27, 2004, although both dates were beyond the purported deadlines for

Hanna's performance.

### 8.  Hanna's "Non-Litigation" Activities on Behalf of SEH

72.  Pursuant to these Agreements, Zomnir asked Hanna to devote substantially all of his

time to representing the interests of SEH in the "put" valuation negotiations.  Thus, Hanna began

active negotiations in September, 2003 to obtain the best possible valuation of Strategic Energy. Hanna was the lead negotiator on behalf of SEH in the Fall and early Winter of 2003.

73.   Hanna actively negotiated with William Downey ("Downey"), GPE's negotiator, regarding the valuation of Strategic Energy, reviewed documents sent to him by Zomnir and appraisers, met with appraisers, and attempted to resolve the issue of whether a minority interest discount would apply to SEH's 11.45% indirect interest in Strategic Energy.  Continuously through mid December, 2003, until Zomnir halted Hanna's involvement in the negotiations, Hanna communicated, almost daily, with Zomnir regarding the status and strategy of the negotiations and exchanged thoughts, strategy, and tactics regarding the process.  Hanna was involved in over 500 e-mails in his work for SEH in this regard.

74.   Throughout the "put" negotiation process, Zomnir repeatedly identified Hanna as the negotiator on behalf of SEH.

75.   In October, 2003, Hanna discovered that he needed to have surgery immediately Hanna's physician told him that Hanna had only a short time to live.  Due to the surgery and life threatening condition, Hanna offered to Zomnir to withdraw from the negotiations.  Zomnir declined Hanna's offer because Hanna was a "critical aspect" of the negotiations.

76.   Although the surgery took place on October 15, 2003, and while he was recovering at home, Hanna was responsible for facilitating a telephone conference between SEH and GPE on October 21, 2003, and addressing the next steps of the negotiations.

77.   On November 15, 2003, Hanna sent an e-mail to Zomnir proposing a process regarding the "put" based on his negotiations with GPE to that point.  That e-mail provided for, among other things, a review by a third valuation expert of the two completed valuation studies,

the third appraiser's determination of a binding number after that review, no minority interest discount on "put", and a payment date of January 15, 2004.

78.  In November, 2003, through many telephone conversations and e-mail exchanges involving Michael Chesser (GPE's chief executive officer), Downey (GPE's negotiator), Zomnir (SEH's chief executive officer), and Hanna (SEH's negotiator), SEH and GPE reached a "tentative" agreement regarding the process and timing by which the valuation of Strategic Energy and exercise of the "put" would occur.  This "agreement" was substantively identical to the proposal set forth by Hanna to Zomnir in the November 15, 2003 e-mail.  However, GPE eventually refused to proceed under the November, 2003 "agreement".

79.  In late November and early December, 2003, Hanna and Downey interviewed representatives of three valuation firms and ultimately selected the same.  The only representative of SEH who met with representatives from these valuations firms prior to the selection of the firms was Hanna.

80.  In late November and early December, 2003, Zomnir allegedly represented to SEH owners and agents that he had halted Hanna's role in the negotiations.  Zomnir allegedly told Pohl that he would halt Hanna's role in the negotiations in late November, 2003.  Zomnir allegedly told Hanna on December 13, 2003 that Zomnir was removing Hanna from the negotiations.  However, Hanna at Zomnir's request continued to work with Zomnir on the "put" negotiations and valuation even after December 13, 2003.

### 9.  Smith Evans Carrier - - Contingent Fee Agreement

81.  In January, 2004, Zomnir contacted Evans and asked if Smith Evans Carrier would continue to assist with the negotiations under an oral contingent fee contract on terms similar to

the SEH oral contingent fee contract with Hanna, but at a 5% of proceeds over $600 million for Smith Evans Carrier (plus out-of-pocket expenses), rather than the 20% for Hanna, but again without deadlines.  Smith Evans Carrier agreed.

### 10.  Pohl's Litigation Activities

82.  In late 2003 and early 2004, Jones Day implemented the litigation plan, by preparing draft complaints on behalf of SEH.  The basic drafting was performed by Tom Jones ("Jones") who is an attorney at Jones Day's Pittsburgh office who worked with Pohl on the SEH matter.

83.  In a draft prepared in or around December, 2003, in Count V, SEH sought specific performance of the November, 2003 "agreement" (see Findings of Fact 78) between SEH and GPE regarding the process to value Strategic Energy.  The third and fourth versions of the draft of the complaint stated that the SEH/GPE "agreement" had been consummated during the Fall of 2003, and said drafts discussed provisions regarding the number of appraisers who would value Strategic Energy, the projections that would be used, and assumptions that would be used.

84.  Jones obtained the information for the drafts from three sources: conversations with Pohl, Babst, and Zomnir; reviewing documents; and corporate structure information obtained from Leo Hitt, an attorney with Reed Smith LLP.

85.  Ultimately, by letter agreement dated February 9, 2004, SEH and GPE agreed to a process whereby, (a) three appraisal firms would assign both a discounted and non-discounted value to Strategic Energy; (b) the question of whether a minority interest discount should apply to SEH's 11.45% interest in Strategic Energy would be submitted to a neutral arbitrator; and (c) after the neutral's decision regarding the applicability of a minority interest discount, the average of the relevant numbers from the appraisal firms would be the enterprise value for Strategic

Energy.

86.  In substance, the February 9, 2004 letter agreement was similar to the November, 2003 "tentative" agreement concerning the process of valuation and payment, which was similar to the proposal suggested by Hanna to Zomnir in the November 15, 2003 e-mail (except the "neutral arbitrator" idea which originated with Pohl).

### 11.  Arbitration re: Minority Interest Discount Issue

87.  The neutral selected to decide whether or not there would be a minority interest discount was retired Judge George C. Pratt (United States Court of Appeals for the Second Circuit).

88.  On February 23, 2004, after several calls in February between Zomnir and Hanna, Zomnir sent an e-mail message to Hanna requesting that Hanna make himself available for a call with Zomnir and Pohl to prepare for a March, 2004 arbitration before Judge Pratt.

89.  During a call with Zomnir, prompted by the e-mail, Hanna asked Zomnir whether Hanna should discuss with Pohl the payment arrangement promised by Zomnir, namely Hanna's entitlement to 20% of SEH's portion of the value of SEL over $600,000,000.  Zomnir said that Zomnir would discuss the issue with Pohl.

90.  Hanna attended the arbitration in Uniondale, New York, before Judge Pratt, and testified on behalf of SEH, as did Zomnir, Babst, and Purdy.  Hanna was not asked specifically about the Contingent Fee Agreement at the arbitration, only about "compensation" in general and whether he had "any financial interest in the outcome of the [arbitration]."  The Contingent Fee Agreement was not disclosed.  Defendant argues that this failure to disclose is proof that the Agreement had lapsed.  Based upon the credibility of the witness, including several hours of

videotaped depositions of attorneys who participated in the arbitration, the Court as the finder of fact disagrees that the specific questions and answers thereto so prove. The questions were not sufficiently specific to decide whether "deadlines" were part of the Contingent Fee Agreement especially in light of the other Findings of Fact above. No transcript exists of the arbitration.

91. During the arbitration, Zomnir testified that he owned 6.4% of the SEH 11.45% interest in Strategic Energy, as set forth in the SEC filings referred above. During the same arbitration, however, Babst testified that Zomnir actually owned something closer to 3% and that Babst, Calland, and Clements each owned 1%. In fact, as of the date of the arbitration (March 10, 2004), Zomnir owned only 2.76%. Zomnir admitted to Hanna after the arbitration that Zomnir had lied about his ownership interest in Strategic Energy and that he consistently misrepresented that he owned more than he actually did.

92. Judge Pratt ultimately determined that no minority interest discount should apply to SEH's "put" interest.

### 12. Final Valuation

93. In 2000, the highest offer that could be obtained to purchase Strategic Energy was $45,000,000. In 2002, Zomnir was willing to accept a valuation of between $325,000,000 and $350,000,000 for Strategic Energy. In September, 2003, Zomnir told Hanna that Zomnir would be happy and willing to accept a valuation of $500,000,000 for Strategic Energy. Thereafter, after several months of negotiations led by Hanna, SEH was willing to accept a valuation of $625,000,000 for Strategic Energy. Based upon the non-discounted average of the values of Strategic Energy submitted by the three valuation firms, the final total valuation of Strategic Energy was determined to be $776,000,000.

**13.  Zomnir Denies Existence of the Daily Fee Agreement and Contingent Fee Agreement**

94.  Zomnir and Hanna talked by telephone on March 31, 2004 when Zomnir told Hanna the final numbers from each of the valuation experts and the final "put" valuation of $776,000,000.  During the call, Hanna asked Zomnir how Zomnir wanted to handle payment of Hanna's compensation - - the daily fee, plus the contingent fee since the valuation exceeded $600,000,000.  Zomnir immediately reacted angrily to Hanna and denied the existence of any obligation to pay any compensation to Hanna.

95.  Zomnir told Hanna that he was not entitled to compensation because Hanna did not close the deal within some alleged required time frame.  Zomnir's position thus was that Hanna did all his work for free or that Hanna should look to GPE for payment even though the benefit of Hanna's work accrued to Zomnir and his partners.

96.  As stated above, the Court finds that prior to March 31, 2004, Zomnir never mentioned time frames or deadlines to Hanna as a condition for payment under the Daily Fee Agreement and Contingent Fee Agreement.

97.  Such deadlines would have been inconsistent with Zomnir's conduct throughout the negotiation process, wherein Zomnir continually changed target dates for proposed valuation deadlines and payment dates, one of those changes, as early as November 16, 2003, extended beyond the deadlines SEH now claims existed for Hanna to complete his negotiations.

**14.  Benefits to Zomnir and SEH and Others**

98.  Hanna fully performed under the Daily Fee Agreement and Contingent Fee Agreement.

99.  As a result of the "put," Zomnir received in excess of $20,000,000 of the approximately $88,000,000 paid to SEH in this "put" transaction.  Babst, Calland, Clements, Purdy, Booritch, Molinda, and Kubacki likewise received significant proceeds.

100.  Hanna conferred a benefit on SEH; namely, Hanna actively negotiated on behalf of SEH which led to a total valuation of Strategic Energy in excess of $600,000,000.

101.  During Hanna's work for SEH, he actively negotiated on behalf of SEH with GPE, including negotiating the framework of the valuation process ultimately agreed to by GPE and identifying and selecting the three valuation firms ultimately used to determine the total valuation of Strategic Energy.

102.  Hanna was a "critical aspect" in achieving a valuation of Strategic Energy of $776,000,000 that formed the basis of the payment for SEH's "put" interest.  Prior to his involvement in the negotiations, SEH was willing to accept as little as $350,000,000 and as much as $500,000,000 as the valuation of Strategic Energy.  However, several months after Hanna's involvement, SEH was prepared to accept a valuation of $625,000,000 for Strategic Energy.

103.  Hanna's contribution was substantially more than that of Smith Evans Carrier. From October, 2003, the time an oral contingent fee contract existed between SEH and Smith Evans Carrier to March 31, 2004, Evans estimates Smith Evans Carrier performed between 50 and 500 hours of work for SEH.  Evans can be no more precise in the estimate of hours worked. As a result of the oral contract with SEH, Smith Evans Carrier earned slightly more than one million dollars; approximately $900,000 of which has already been paid to Smith Evans Carrier.

104.  Smith Evans Carrier, a well known and respected valuation firm, earned 5% of the excess for the work it performed on behalf of SEH.  Based upon all the evidence, this Court finds

that Hanna's contribution to SEH was four times (20% of the excess) Smith Evans Carrier's

contribution to SEH.

### 15.  Damages

105.  According to the Contingent Fee Agreement between Hanna and SEH, Hanna is

entitled to be paid $4,030,400 (20% x (11.45% x (776,000,000 - 600,000,000))), as well as

$367,500 under the Daily Fee Agreement (49 days x 7,500).

## II.  Conclusions of Law

### A.  Breach of Contract - Contingent Fee Contract (Count I)

Under Pennsylvania law, a breach of contract claim "involves (1) the existence of a

contract, (2) a breach of a duty imposed by the contract, and (3) damages." *Sullivan v. Chartwell*

*Inv. Partners, LP,* 873 A.2d 710, 716 (Pa. Super. 2005)(citing *J.F. Walker Co., Inc. v. Excalibur*

*Oil Group, Inc.,* 792 A.2d 1269 (Pa. Super. 2002)).  A contract may be manifested orally in

Pennsylvania.  Id. at 716.  Plaintiff bears the burden of proving the existence and terms of the

oral contract, defendant's breach of the contract, and resulting damages.  *Idell v. Falcone*, 235

A.2d 394, 396 (Pa. 1967).

As stated above, on September 23, 2005, at Palomino's restaurant, Zomnir (on behalf of

and with full authority from SEH) and Hanna entered into a Contingent Fee Agreement.  *See*

Findings of Fact 67. The terms of the contingent fee contract were that Hanna would work to

assist SEH in obtaining a high enterprise valuation for Strategic Energy, and if such enterprise

value exceeded $600,000,000.00, Hanna would be paid 20% of SEH's 11.45% interest as a result

of the portion of the valuation exceeding $600,000,000.00.  As stated above, this Court finds that

this contingent fee contract contained no deadlines.  *See* Findings of Fact 68.

Hanna fully performed his duties under the Contingent Fee Agreement, and ultimately, the enterprise valuation of Strategic Energy was determined to be $776,000,000.  Therefore, Hanna's contingent fee for a valuation of $776,000,000 is $4,030,400 (which is 20% multiplied by 11.45% multiplied by the difference between $776,000,000 and $600,000,000).

The proper measure of damages in a breach of contract action is generally that which would place the aggrieved party as nearly as possible in the same position he or she would have been in had there been no breach.  *Com., Dept. of Transportation v. Brozzetti,* 684 A.2d 658, 665 (Pa. Cmwlth. 1996) (citations omitted).  Because SEH has failed to pay Hanna the contingent fee to which Hanna was entitled under their express oral agreement, SEH has breached the contract and Hanna has suffered damages in the amount of $4,030,400.

Further, in addition to the $4,030,400, Hanna is entitled to prejudgment interest. *Somerset Community Hospital v. Allan B. Mitchell & Associates, Inc.,* 685 A.2d 141, 148 (Pa. Super. 1996).

## B.  Breach of Contract - Daily Fee Plus Expense Contract (Count III)

As stated above, plaintiff bears the burden of establishing the existence and terms of the alleged Daily Fee Agreement, defendant's breach of said contract, and resulting damages.  This Court has found that Hanna and Zomnir (on behalf of and with full authority for SEH), entered into a Daily Fee Agreement during a telephone call in early September 2005.  *See* Findings of Fact 65.  Zomnir and Hanna agreed that Hanna would assist Zomnir in negotiating on behalf of SEH on exercise of the "put" and that Hanna would be paid $7,500 per day for his services.  That fee, which was not contingent upon Hanna negotiating any particular outcome or any particular

deadline, did not cover Hanna's expenses.

Also, just like the Contingent Fee Agreement, defendant breached this Agreement by failing to compensate Hanna for his services.  Accordingly, Hanna has been damaged as a result thereof, in the amount of $367,500, which represents the 49 days Hanna worked multiplied by the $7,500 rate per day.

In addition to the $367,500 that Hanna is owed  as damages on the daily fee contract, Hanna is also entitled to prejudgment interest on these damages.  *Somerset Community Hospital,* 685 A.2d at 148.

### C.  Plaintiff's "Alternative" Claims

In his Complaint, plaintiff alleges several alternative claims including breach of unilateral contract (Count II), quasi-contract (Count IV), and estoppel (Count V).  Because this Court has found that there was an express oral contract on the Contingent Fee Agreement claim (Count I) and the Daily Fee Agreement claim (Count III), this Court finds that plaintiff's alternative claims for breach of an alleged unilateral contingent fee contract, quasi-contract  and estoppel are not applicable and therefore will not address them.[4]

---

[4]But for the Court's finding on the oral contingent fee agreement, this Court would have awarded to Hanna at least four times the amount given to Smith Evans Carrier in the form of quasi-contractual relief.  *See* Finding of Fact 104.

### D.  **Conclusion**

_____Based upon the credibility determinations set forth herein above, this Court finds in favor of plaintiff, and against defendant, on plaintiff's express breach of contract claims under the Contingent Fee Agreement and the Daily Fee Agreement (Counts I and III).  An appropriate order follows.


s/Arthur J. Schwab_____
Arthur J. Schwab
United States District Judge



cc:     All counsel of record as listed below

Thomas R. Johnson, Esquire
Jeremy A. Mercer, Esquire
Kirkpatrick & Lockhart
535 Smithfield Street
Henry W. Oliver Building
Pittsburgh, PA 15222-2312

Mark D. Shepard, Esquire
Babst, Calland, Clements & Zomnir
Two Gateway Center, 8th Floor
Pittsburgh, PA 15222

Richard J. Antonelli, Esquire
Spilman, Thomas & Battle
301 Grant Street
3440 One Oxford Centre
Pittsburgh, PA 15219